Thank you. Let's proceed to the next argument. 18-1076, Estate of Joseph Duke v. Gunnison County Sheriff May it please the court. My name is Elizabeth Owen. I represent the Estate of Trey Duke and Mr. and Mrs. Duke, the parents of, of course, the man who died, in this case, Trey Duke. As a general proposition, a law enforcement officer who leaves an intoxicated man for dead in jail violates the United States Constitution. The defendants have advocated in this case, and the district court agreed with them, that there is a more specific proposition that warranted the grant of qualified immunity to the individual defendant officers, both the patrol deputies and the jail deputies. Well, the law of the United States is not ever that broadly articulated, is it? That a person that dies in jail because of intoxication exposes the jailer to liability in and of itself? A person who dies of intoxication in jail, without more, certainly, there would be a lot more to this story, Your Honor. The issue here is, of course... So that's not this case. Let's start there. Sure. All right. Fairly good enough. Yes. And, of course, under the applicable Eighth Amendment standards, our position is that each of the defendants in this case was aware of the conditions that led to Mr. Duke's death, as the Eighth Amendment requires. Was there any evidence they were aware that he had at some point ingested a package of narcotic drugs in his intestines, which later ruptured? It's a great question, Your Honor. Of course, as a general matter, the defendants were aware. And I say, of course, because this is the reason for Mr. Duke's arrest. And there was this very particularized drug recognition examination done that determined that Mr. Duke, at the time of his arrest and then, of course, throughout his incarceration, was under the influence of a narcotic analgesic. I understand the Court's question to be much more specific. I didn't even understand Judge Ebell's question to be that. And I've been sitting here wondering, how on earth did somebody swallow a baggie with drugs in it? I mean, how do you – it seemed to me you choked to death. Oh, well, that is an area on which I'm not an expert, Your Honor. I'm pleased to announce. Neither am I. And I'm going to leave it back to Judge Ebell's question, because I'm still waiting for the answer. But I'm sure he's going to defend his own question. Sure. One of the problems in this case, Your Honor, is that the defendants never took Mr. Duke to receive any sort of medical examination. And we had put forth expert reports, obviously not testimony, because we didn't get to trial. In this case, it indicated that had that happened, we might actually know the answer to that question. Medical testing would have likely revealed whether or not Mr. Duke had a plastic baggie containing fentanyl in it. How would that have been discovered other than if they had submitted to him an ultrasound or MRI or something? Sure. So our – Well, I mean, I may not agree with that, Your Honor. I think that when somebody presents as intoxicated as Mr. Duke did – and I want to be really clear that this is not a case of casual intoxication or normal intoxication. Mr. Duke was, you know, passing out throughout the course of his arrest. He fell off a bench in the booking area. And so perhaps – But in addition, he got up, made a phone call, had breakfast, I think went to the restroom. I mean, those are – it's not comatose. He wasn't bad. I mean, he was able to make a phone call, know how to dial a phone and talk to someone. And so, I mean, that's – you know, the cases we have about being comatose and what you can drug test are very different. If a person can make a phone call and use a restroom and have breakfast, presumably he could give consent for blood. And this decedent clearly did not give consent. So first, Your Honor, with respect to the distinction, obviously the district court drew a very particularized distinction between consciousness and unconsciousness. And I want to actually address a point about Mr. Duke's state throughout the course of the evening. Obviously, he was in jail for a long time. So if we start at the end of the timeline, I would disagree with the court's point that Mr. Duke was not in a comatose state. At the time that Ryan Phillips observed Mr. Duke, which is the last true observation before Mr. Duke died, he was unconscious. And that was only minutes before he was observed dead, is that correct? It was about 30 minutes before. And not only did he observe Mr. Duke in that state, but an inmate trustee, Brandon Morse, who was standing there, also observed Mr. Duke in that state. And he said, hey, Ryan Phillips, this guy doesn't look so good, suggesting perhaps he should do something about it. And Ryan Phillips didn't do anything about it, but looked at Mr. Morse. And I would implore this court to watch the video of this time frame. You can see Ryan Phillips look at Brandon Morse and say something. And Brandon Morse says that what he said is, that's what drugs will do to you. That is quintessential deliberate indifference. And it's also an observation of Mr. Duke in the precise state that the Tenth Circuit held in Garcia constitutes a violation, disregard of which constitutes a violation of an inmate's constitutional rights. I would distinguish Mr. Phillips, the claim against Mr. Phillips on that ground in particular, and I think that this court must reverse the district court's order for those reasons. But to the court's point about Mr. Duke waning consciousness throughout the evening, I think that it is a – there is a fact question that the defendants would certainly present to a jury about whether Mr. Duke's consciousness, and the fact question being tied into the qualified immunity question, of course, or whether Mr. Duke's consciousness vitiates the idea that he was presenting with an objectively serious medical condition throughout the course of his incarceration. But again, it's a fact question, and I think that the district court shouldn't have resolved it against Mr. Duke, his estate, at the summary judgment stage. But I would also advocate that this distinction between consciousness and unconsciousness is far too narrow to support the court's affirmance of the district court's summary judgment order in this case. The Garcia case – Counsel, I just want to make sure I understand the facts. Is it correct that because of the officer's concern that maybe he was under the influence of drugs, they actually called in some state patrol or other specialists to come in and evaluate your client? And what was the result of that evaluation, if that understanding is correct? That understanding is correct, Your Honor, and I think it's a really important fact in this case. Ian Clark, who was the arresting officer, called two state patrol officers in to conduct what's called a drug recognition evaluation. These are sort of supplemental to roadside sobriety tests. So the purpose of Mr. Clark calling in the DRE examiners was to determine whether Mr. Duke was under the influence of drugs such that he could prosecute him or suggest to Mr. Duke's parole officer, because he was on parole at the time of this arrest, prosecute Mr. Duke for intoxication. So the crime here was intoxication, in part. He was also charged with possession. And so, indeed, it is true that they called in experts to determine Mr. Duke's intoxication and the level of it and the result, to Your Honor's question, were that Mr. Duke was under the influence of a CNS stimulant and a narcotic analgesic, which, of course, is not specific, but I will tell this court that fentanyl is a narcotic analgesic. And the other thing that I think is important, Your Honor, that the DRE exam revealed is that Mr. Duke's pulse was elevated. His blood pressure was elevated. His pupils were not in a normal state. And all of that information led to conclusive confirmation that Mr. Duke was under the influence of drugs. At what time was that in our timeline? Oh, gosh. At the specific time, I believe it was about 5-10 in the afternoon, but I could be wrong about that. But generally, I mean, it was in the early evening, late afternoon. And then what time was he observed eating breakfast and making a phone call? He was found dead at about 9 o'clock in the morning the next day. So this is June 27th on the day that the DRE is conducted and he's arrested. And he died and ate breakfast shortly before he died early in the morning, about 8.30 is when he had breakfast,  Was his condition more alert at breakfast time the next day than at the time of admission to the prison? I think it was less alert. I mean, I would suggest that that's a fact question that a jury might answer rather than me if you want my personal opinion. We're on summary judgment. But, you know, I think the evidence suggests at least that he was actually less alert, that the most alert that Mr. Duke ever presented was in the evening when he made phone calls, after which he was either sleeping or unconscious. I appreciate the defendant's infusion of the philosophical discussion of what sleep is into this case. I think we can infer that he was unconscious in light of his autopsy. Was an autopsy conducted? There was an autopsy. And it was discovered that he had a baggie in his stomach? There was a baggie in his stomach. And probably the cause of death was the baggie breaking and releasing a massive dose of drugs into his system? That is the inference, Your Honor. All right. And has the cause of death been opined? Yes. The forensic pathologist who conducted the autopsy says that he determined that the cause of death was a polydrug overdose. And he very specifically said that he couldn't say that it was specifically the fentanyl. The level of fentanyl in Mr. Duke's stomach was the highest of all of the drugs that he had on board. But the forensic pathologist was very clear in his deposition that he could not specifically, you know, isolate the fentanyl. The defendant's expert, of course, has opined that it was the fentanyl specifically. Our experts have implicated the severity of the fentanyl toxicity, but have not gone so far as to agree with the defense experts on that point. One of the things I am concerned about, I don't know how much weight to give it, is the evidence, the allegation that some of these officers fabricated the degree to which they observed this defendant. That's, you know, in my opinion, very serious. I don't quite know, and that's alleged, I don't quite know how essential or helpful that is. Would you think you should win this appeal? Do you think that's critical to your winning? Do you think you would win anyhow? How much weight does that fact that the officers fabricated their reports weigh? Your Honor, I don't think that it answers the qualified immunity question, which is the hurdle, as is always the case that we have to get over here, with respect to the individual capacity defendants. I share the Court's concern that it's not okay for law enforcement officers to fabricate records. The evidence that that happened is comparison of the time check sheet with the video, and I will tell you, I personally went through and watched all the hours of video to confirm that they were not actually checking on Mr. Duke at the time that they said that they checked on him. But I do, so in answer to the Court's question about the weight to give that information, I don't think that it is dispositive in the context of qualified immunity, and I don't think it's dispositive in the context of the county claim, but I do think it matters. If the Court is to get to the question of these individuals' actual deliberate indifference, I think that it is great evidence that they knew that they were disregarding the risk that Mr. Duke was not. So you're saying if it goes to trial, it will be a factor for influencing the jury, but that it doesn't help you in qualified immunity because there's no precedent out there about clearly established liability if you fabricate your officer's reports. Unfortunately, yes. Well, you have to deliberate indifference has both an objective and subjective component, and it seems to me that that would be relevant, at least getting over the fact hump that they subjectively were aware of a risk and ignored it. And is your argument that, or is it just that the seriousness of the condition was an obvious risk and that any reasonable person would have known this person needed medical attention? So the obviousness is strong. We do agree with the second proposition, Your Honor, but to the point of the, you know, fabrication of the time check sheet, I think it's the first point that Your Honor made, which is that it is evidence of the subjective knowledge. Thank you. I'll reserve the remainder of my time. Counsel, let's hear from Edison. Still morning. Good morning, Your Honor. Josh Marks on behalf of the appellees in this case, which consists of the Gunnison County Sheriff's Office, the Gunnison County Sheriff, and seven deputies. Your Honor, the key holding in this case that the individuals in this case were immunized under qualified immunity should be upheld. The legal precedent is simply not there. The relevant inquiry that this Court has to decide is whether the preexisting case law put all law enforcement officers and jail officials on notice that someone in these reduced circumstances required medical attention before they discovered him dead in his cell from fentanyl exposure. That analysis requires a couple of things. One is the case law has to put this proposition beyond debate. I mean, it has to be very, very clear to law enforcement officers that someone who is intoxicated like Mr. Duke needed to go to the hospital. The other thing that- Well, Garcia does somewhat, does stand for that proposition. And, you know, I look at this case and I read somewhere recently that there were something like 70,000 opioid overdose deaths last year. And I would think that law enforcement officials, I don't know about Gunnison or Montrose County in particular, but that law enforcement officials would encounter these, you know, people taking fentanyl with somewhat regularity. And it seems obvious that they carry around a medication that will, that's an antidote even. I don't know if that's true and you can tell me if it's true in the record. But you can see my point is that wouldn't, you know, an average, you know, objective police officer know that an overdose risk is kind of the new world order that we live in. It's not a meth or heroin or cocaine. It's a degree of deadliness that we haven't seen before. Sure. Fentanyl is incredibly potent, right? It's 15 more times potent than morphine overdose. And because of it, it kills, it's in the record, in a matter of minutes. At the time, you've got to remember, this is back in 2015. This is as the opioid crisis was just getting going. It's, you can't compare it to what we know today. And at the time, the deputies did not carry an arcanine. Not in the record, but they since have, as many law enforcement and jail agencies now have that on hand. But you've got to remember, we're talking about 2015. You're also talking about a situation where it's very different from Garcia. In Garcia, the decedent was brought into the facility absolutely unconscious, absolutely no functioning whatsoever. And he stayed in that facility, stayed in that state, I'm sorry, for the next six hours and never stirred from that state and was found dead six hours later. And under those circumstances, this court did reach the constitutional question and said, yes, he needed medical care under those circumstances. Now, Garcia, and this court has distinguished Garcia from situations where you have intoxicated inmates in jails. But they're conscious and functioning. And that's the Betz case. And that's the estate of Hocker case that's cited. In both of those cases, the detainees were intoxicated and sometimes severely intoxicated. And this court distinguished Garcia that Garcia doesn't control that analysis because the inmates are conscious and functioning but highly intoxicated. And that's the key difference in the case. And that's what the trial court properly did. You argued that fentanyl can kill in a matter of minutes. And I know there's toxicology reports in the record. But is there anything that would show whether the dosages, the levels that were detected in Mr. Duke's body would have been lethal within minutes? Because he wasn't there for minutes. He was there for 15 hours. For hours, right. Right. Well, yes, the plaintiff's expert, Dr. Tiona, and I can't give you the sites of that. Look at appendix 406, page 406. She's the one who says that fentanyl will kill in a matter of minutes. The tox reports done in this case, the blood examination, showed that he had 15 nanograms per milliliter or something like that of fentanyl. Maybe in a way this is one of maybe the best reasons that I can think of immediately for why we should have these hearings in places like Grant Junction. With little children and students at all ages listening. Because the broader message here is drugs can kill you and they can kill you fast. And you have no business touching the bloody things. Now, that's the background. Let me deal now with the legal aspect of it. So you have an innocent person, presumed under American law to be innocent. They are now in the custody of police. They have no option. They can't walk out and go to the doctor. They can't walk out and go to the hospital. They can't go home and demother and cry. They are in jail. So we now have a special obligation that's created with respect to the law enforcement, where they become quasi-hospitals for drug users. And the question is, if we've said, if you're blooming bloody unconscious for six hours, law enforcement better do something. They better move them to a hospital fast. You're saying we should distinguish this case because he wasn't in bad enough shape that they needed to call a doctor? Sure. Mr. Duke was functionally equivalent to the decedent in Beggs v. Martinez up until those last few minutes. In fact, one could say he's in better shape than the decedent in Beggs v. Martinez, who needed assistance ambulating him back and forth. Mr. Duke, if you look at the videos, is walking to and from. He's getting an examination by the state troopers early in his stay. And he's able to get up, stand, walk, follow directions, go to the bathroom, come back. He comes into the report-writing room under his own power. He's doing what an apparently drug-intoxicated person would do in jail, and that is letting the body detox. It doesn't look pretty. A lot of times people are sleeping or they're vomiting or they're uncomfortable. But he's doing, from all apparent appearances to the deputies, what a normal detoxing person in that condition would be doing. And it's not until the very end when he suddenly expires from the fentanyl. And that's why this is so different from Garcia and more aligned with the Beggs and the estate of Hawker case. What about Judge Ebel's question that to the extent that officers fudge or cover up the testimony, you can understand why that causes us concern because now we don't know who to believe. And I agree with Ms. Owen that it has no effect on the qualified immunity analysis that you have to conduct. But first of all, let me back off of that. Should it? No, it shouldn't. It shouldn't. There is, well, unless this court wants to hold for the first time that someone who fabricates their police report could be held liable. Or that that is evidence of the, as Judge Dimkovich asked, is evidence of the subjective intent. But that goes to the merits, not whether the law has been putting people on notice as of 2015. It's a different question. But it could affect the analysis if this were ever to get to a trial. But the problem with that is I think it's a misnomer to say there was fabrication here. These log entries were done before Mr. Duke expired. These deputies didn't go back and change their time entries. Now, it's true the time entries that are in the check sheet don't match up with the video. But that is because the Gunnison County Jail is a very small place. Average population is 20 to 25 prisoners. And at times they only have a couple people on duty. And over time, they got a little lax in what they required in terms of check sheet. And they allowed their deputies sometimes to do checks based on the audio or video system in these holding cells. And that's what happened here. The testimony was that the person in the control room was listening and hearing sounds of Mr. Duke sleeping during the night. And the disputed checks occurred during the night. It didn't occur in the last hour in which he had actual interactions with the deputies. Where the deputies came, they fed him breakfast. They asked him, are you done? He said no. And so they went away. Deputy Phillips comes at 830 and sees the food tray and sees him, sees the rise and fall of his back. And concludes that he's sleeping. And he's in a position that Deputy Phillips says, I've seen him in that position before. Mr. Duke is not, he's a frequent flyer in this jail. They've seen him in that capacity. They've seen him intoxicated and detoxed. So it's a very different situation. So the deputy at that point reasonably believes that he's detoxing. A half hour later, another deputy goes by at 9 o'clock on his way out the door and sees Duke in the same position, also breathing. And it's five minutes after that that Duke is discovered deceased, which is consistent with fentanyl intoxication. Mr. Duke had five times the lethal level of fentanyl in his system. So he could have died five times over without lethal level of fentanyl. So it explains why the behaviors are consistent in terms of him sleeping, he's off drugs, and then suddenly expiring. So when you look at the analysis of what is the risk of harm, what is the serious medical condition for purposes of the Eighth Amendment, it's death by fentanyl exposure. And the question for this Court of the Eighth Amendment is, what signs were there of fentanyl exposure? And the symptoms of fentanyl exposure are severe, are respiratory distress, are seizures, coma, death. It's not like a cold, either. And there's no evidence in the record that the deputy saw any of those symptoms, any of those unambiguous symptoms that someone was heading into a fentanyl death. You did the same thing in the Martinez-Bubetz case. They thought he had taken heroin? One deputy thought he had taken heroin, and they put it down in the questionnaire. Did they discover heroin on his body? Yes, and that was the reason that they thought he was on heroin. Plus, I think they had some pre-existing. It's not in the record, but they had some pre-existing experience with him. He's known as someone who was addicted to heroin. So all those factors are at play in this case. Now, what the state wants you to do is to say, well, let's lower the bar for when medical attention is required in this case, because he was seriously intoxicated, and he should have been given medical attention not to treat his intoxicated symptoms, which were mild or not in need of medical care, but to find out if he had fentanyl in his system. So what they want to do is say, they want to flip the Eighth Amendment on its head and say, well, you don't need medical care for a medical condition, but you should have gotten medical care for informational purposes, so we could have discovered this, the equivalent of a ticking time bomb in this guy's system. That's not what the Eighth Amendment is buttressed. That's not the basis of it. And so that's why the trial court here had a fairly easy time of finding that the defendants were entitled to qualified immunity and finding no municipal liability. And granted, we would request that this court affirm that decision in all respects. Thank you, counsel. Would you please give Ms. Owen two minutes? Thank you. As this court is aware, the Eighth Amendment prohibits reckless conduct. What I just heard defense counsel say and what has been repeated throughout this case is that employees of the Gunnison County Sheriff's Office, including the defendants in this case, and condoned by the lack of policy or practice and the training that defendants received on how to do their job by the Gunnison County Sheriff's Office, was to leave Mr. Duke while he was extremely intoxicated without any further monitoring. That is not only a pattern in practice and policy and custom of recklessness, which implicates the Gunnison County Sheriff's Office municipal liability claim, but it is evidence that the defendants disregarded, in this particular case, Mr. Duke's severe intoxication. And I agree with Your Honor. It is obvious that somebody who is extremely intoxicated is at risk of overdose. That is not a novel proposition in this country in this day, whether we're talking about 2015 or 2018. And I also want to address the point about the Martinez case. The distinction in that case, the court in that case, did not distinguish Garcia on the basis of consciousness versus unconsciousness. The plaintiff lost in Martinez because he died of the state loss because the inmate died of a condition that the jail officials didn't know about. He died of a heart attack when the jail officials knew that he was intoxicated on alcohol. And I believe that the theory posited was that, well, somebody who is an alcoholic is at higher risk of heart attack, and so you should have known by virtue of his alcohol intoxication that he was going to die of a heart attack. And that's the distinction. So, you know, to the dish report sort of hair-splitting on this consciousness or unconsciousness, I think that that's not a correct read of Martinez. Thank you. Thank you, Counselor. Your time has expired, and the case shall be submitted to the Counselor-Excused. I want to thank and congratulate all the attorneys that argued before us today, and I'm especially appreciative to the many students and community citizens that came to Colorado Macy University to hear our arguments today. We're very, very grateful that you had a chance to see the court in action. The court will be in recess, but there will be a luncheon for those that were invited at the University Center at 1245, and we're going to reconvene at 2.30 in Dominguez Hall and take questions and answers. And I know students are invited to that, and I suspect members of the public would also be welcome. So court shall be adjourned until further notice.